IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DALE GENE DUNSON,

                Petitioner,               14cv1178

                                         **ELECTRONICALLY FILED**

                      v.

JOHN E. WETZEL, Secretary of
Pennsylvania Department of
Corrections and LAWRENCE
MAHALLY, Superintendent of the
State Correctional Institution at
Dallas,

                Respondents.

# MEMORANDUM OPINION

## I.    Introduction

Petitioner, Dale Gene Dunson, filed a timely *pro se* Petition Under 28 U.S.C. § 2254 for

Writ of Habeas Corpus by a Person in State Custody (doc. no. 4) seeking relief from a 2009

conviction and sentence of twenty to forty years incarceration[1] for third degree murder following

a bench trial in the Court of Common Pleas of Allegheny County, Pennsylvania, before the

Honorable Lester G. Nauhaus.  Petitioner had been charged with one count of criminal homicide.

The evidence presented at trial established that Petitioner shot Tyrone Edwards, in the back of

the head, killing him.

After careful review of the habeas petition (doc. no. 4), the Commonwealth of

Pennsylvania's Response (doc. no. 16), the Petitioner's Reply (doc. no. 26), and the state court

records, including transcripts of the proceedings as well as the Opinions of the Court of Common

---

[1] This sentence was to run concurrent to a 30-month federal sentence imposed by Judge McVerry.

Pleas and of the Pennsylvania Superior Court denying Dunson's petition for relief under

Pennsylvania's Post Conviction Relief Act, and applying the deferential standard of review

required under AEDPA, this Court must deny this § 2254 Petition for habeas relief and declines

to issue a certificate of appealability. In addition, the Court will also deny as moot (for the

reasons set forth below) Petitioner's Motion for an Evidentiary Hearing. Doc. no. 25. The

Court's reasons for ruling in this fashion are set forth in detail below.


## II. Procedural and Factual History

Tyrone Edwards was shot and killed on September 16, 2006. Petitioner was charged with

this fatal shooting.

### A. Factual Summary of the Evidence Presented at Trial

On the day of the shooting, the police were summoned to a housing project in the Hill

District section of Pittsburgh. See 9/29/2009 Trial Transcript (hereinafter "TT"), p. 15-16. Upon

their arrival, the decedent, Tyrone Edwards, was not present – he had been transported to the

hospital by a private vehicle. Id., p. 25.

During the trial, Police Officer Weismantle testified that the police found two shell

casings on the sidewalk in front of house number 2081, Bentley Drive. Id., p. 26. The police

determined where on the premises Tyrone Edwards had been shot from the pool of blood which

was found approximately 100 feet away from the two shell casings. Id., p. 29.

Police Officer Smith testified that upon his arrival at the scene of the shooting, he located

the large pool of blood and was approached by two females who had been standing on the street

near the pool of blood. Id., p. 34. The first female, Sharelle Edwards, indicated that she had

seen Tyrone Edwards get shot by Dale Dunson. Id., p. 34-35. The second female that Officer

Smith spoke to, Shela Thomas, told him that she too had seen the shooting and indicated that "Dale" was the shooter. Id. p. 36.

Shela Thomas, who was also called to testify during the trial of this matter, stated that on the day of this shooting she had been standing in front of house number 2050 on Bentley Drive and was with friends. Id., p. 40. Ms. Thomas testified that she heard an argument between Dale Dunson and Sharelle Edwards taking place on the opposite side of the street, about one "courtyard" away from where she was standing. Id., p. 42. Dale Dunson was on the opposite side of the street, but Sharelle Edwards was on the same side of the street as Shela Thomas. Id., p. 43. Shela Thomas testified that Dale Dunson's brother was also present during the period of time that Petitioner and Sharelle Edwards were arguing. Id., p. 44. Dunson's brother became involved in the verbal argument when Tyrone Edwards "stuck his head out of a window" and shouted for Dunson to stop calling Sharelle Edwards names. Id., p. 45. Eventually, Tyrone Edwards came out of the building, walked down the street toward Dale Dunson and his brother, and continued to tell Dale Dunson to stop calling Sharelle Edwards names. Id., p. 46. According to Shela's testimony, while Dale Dunson's brother continued to argue with Tyrone, Dale Dunson disappeared for a moment, appearing to have walked to the back of the court. Id., p. 46-47. When Shela and Tyrone Edwards (and others) turned their backs to walk away, she heard a gunshot, then turning toward the sound, saw a flash (fire), and saw Dale Dunson shoot the gun. Id., p. 47. She saw Tyrone Edwards fall, but did not fully comprehend he had been shot by Dale Dunson until she saw blood rushing from the back of his head. Id. Shela testified that while Tyrone lay bleeding, she saw Dale Dunson get into a car and drive backward on Bentley Drive, away from the scene of the incident. Id., p. 48. Although this incident happened in the early morning hours of September 16, 2006, Shela testified that the lights, located on the outside of the

buildings, were operating and that she knew Dale Dunson and his brother because they lived in the neighborhood. Id., p. 53, 71.

Sharelle Edwards also testified at trial, and indicated that she was on Bentley Drive the morning of the shooting. Id., p. 77. While outside on Bentley Drive she approached Dale Dunson and admitted that they exchanged words. Id. After entering a house on Bentley Drive and returning back outside to the courtyard a few minutes later, she and Dale Dunson again, "exchanged words." Id., p. 78. Sharelle Edwards also testified that her cousin, Tyrone Edwards, heard her argument with Dale Dunson. Id. Tyrone Edwards was inside a building and yelled out of a window. Id. Sharelle recalled that Tyrone was yelling that Dale Dunson needed to stop "disrespecting" Sharelle. Id., p. 79. Sharelle next recalled that when Tyrone eventually came out of the building, he and Dunson's brother began to argue while Dale Dunson seemed to have walked away toward the "back of the court." Id. Sharelle recalled seeing Dale Dunson return "to the front of the court" and saw "sparks" and saw him shoot a gun (she thought he had shot it in the air) before aiming it across the street, pointing it in the direction of Tyrone Edwards, and shooting the gun again. Id., p. 80, 99. When the shooting stopped, she saw that Tyrone Edwards was still lying on the ground and did not realize at first that he had been shot. Id., p. 81. Finally, like Shela Thomas, Sharelle Edwards testified that immediately following the shooting she observed Dale Dunson run to his car and back it down Bentley Drive at a high rate of speed. Id.

Cornell Lee testified that he was with Tyrone Edwards on September 16, 2006. Id., p. 105. They were inside a building (2051 Bentley Drive) standing in the hallway, visiting with Lee's girlfriend. Id., p. 106. At some point in time, they heard the argument between Dale Dunson and Sharelle Edwards and when the argument did not stop even after Tyrone Edwards yelled out of a window, the two men (Tyrone and Cornell) went outside the building and walked

down the street. Id. Cornell Lee testified that he and Tyrone were standing in the middle of the street as they argued with Dale Dunson's brother. Id., p. 107. According to Cornell, Dale Dunson "disappeared, went to the back of the hallway, came back out." Id. Around that same point in time, Cornell said that he and Tyrone were about to leave, when Dale Dunson started shooting a gun. Id. Cornell explained that he and Tyrone were still standing on the street when Dale Dunson returned, and further recalled that Dale Dunson was standing on the top of three steps in front of a building. Id., p. 108. Cornell testified that Dunson aimed in the direction of where he and Tyrone were standing and as they were walking away, Tyrone was shot in the back of his head. Id. Cornell ran and hid behind a parked truck, but after the shooting stopped, he observed Dale Dunson, run to his car and back it down Bentley Drive. Id., p. 109. Finally, Cornell testified that a man he did not know, drove by shortly after the shooting took place, and told Cornell to get Tyrone Edwards in the car. Id. This man drove Cornell and Tyrone to Mercy Hospital. Id.

Police Officer Jeffrey Palmer[2] testified that he was briefed by officers on the scene of the shooting and arrived at Mercy Hospital to interview Cornell Lee and the driver. Id., p. 153. According to Officer Palmer, Cornell indicated that he had been with Tyrone at the time of the shooting, that there had been a confrontation between Tyrone and two individuals immediately prior to the shooting. Id. Palmer stated that Cornell told him he saw a muzzle flash, and realized that Tyrone had been hit in the head. Id., p. 154. Per Palmer, Cornell indicated that he knew Dale Dunson and his brother from the neighborhood, but could not recall their names. Id. Cornell did not identify Dale Dunson or his brother to Officer Palmer as the shooter at that time, but Cornell did state that the shooter was wearing a grey hoodie. Id.

---

[2] Counsel for Petitioner called Officer Jeffrey Palmer, out of order, during the trial.

Detective John Cherf, of the Indiana Borough Police Department, testified that he arrived to assist an officer during a routine traffic stop on December 30, 2006. Id., p. 122-123. Detective Cherf obtained the license for the passenger, and noted that the photo on the license (issued to a person with the name "Major Coats") did not match that of the passenger. Id., p. 123. On December 30, 2006, Detective Cherf asked the passenger to step out of the vehicle. During trial, the Detective identified Dale Dunson as the person who was the passenger in the car. Id., p. 123-124. On December 30, 2006, when the Detective attempted to pat down Dale Dunson for weapons, while he was standing outside the car, Dunson attempted to flee, but was captured and subdued. Id., 124. Next, the officers placed Dunson under arrest, transported him to their barracks, and ran his fingerprints through AFIS. Id., p. 125. From a fingerprint match the police learned his true identity, and discovered that there were several active warrants out for his arrest. Id. Following the presentation of Detective Cherf, the Government rested its case.

Defendant's case began with the presentation of testimony by Mario Resto, who claimed to be a long-time friend of Dale Dunson and his brother, and who claimed to be standing in the doorway of building number 2083, Bentley Drive, on September 16, 2006 at the time of the shooting. 10/14/2009 TT, p. 1-9. During Resto's testimony, Defendant's counsel used a video surveillance recording to assist him with his testimony. Id. Per Resto, the video (which was shot from the direction that Resto was watching from on the morning in question), depicted events before, during, and after the shooting. Id., p. 8- 13. Using the video, Resto was able to identify "a person" standing in the middle of Bentley Drive, as the person who "yelling" at Dale Dunson's brother, David. Id., p. 9. Resto testified that during this section of the video, Dale Dunson was not present. Id., p. 10. Resto also testified that a man by the name of "Brandon" ran to a building yelling that some "dude" had a gun. Id., p. 11. Resto next testified that "a short

time later" he (Resto) looked out his door and saw a guy wearing a hoodie, shooting a gun. Id. Resto testified that he was 100 percent certain the shooter was not Dale Dunson. Id., p. 13. Resto admitted that he did not see the shooting, but that he heard it and claimed to have seen shooter run past after the shooting. Id., p. 16-17. Resto claimed he recalled paramedics arriving at the scene, but he said he did not look to see if the paramedics took the victim of shooting away. Id., p. 18.

After questioning Resto, Dunson's attorney next recalled Officer Weismantle who admitted that he interviewed Shela Thomas at the scene and that took her recorded statement on September 16, 2006. Id., p. 22-31. After questioning this officer about whether Tyrone Edwards yelled at Dale Dunson or his brother, David, the defense rested. Id., p. 31.

During his closing argument, counsel for Dale Dunson argued that Dale was not even present at the time of shooting. Id., p. 32. Counsel argued that Dale Dunson simply dropped his brother off at the housing project then left. Id. A video was offered by counsel as Exhibit "A" which, per counsel, depicted the "altercation start[, then] people fleeing from the scene[,] . . . a vehicle backing out, so on so forth." Id., p. 33. Counsel requested that the trial judge view the video surveillance tape and argued that if the judge believed Resto's testimony, Tyrone Edwards' killer – presumably the person who is fleeing the scene the fastest in the video – was wearing a grey hoodie on the night in question, and was not Dale Dunson. Id., p. 34. Counsel further argued that when combined with Cornell Lee's testimony – specifically that Lee could not recall what Dale Dunson was wearing at the time of shooting – but only knew that the shooter was wearing a grey hoodie, the judge would have to conclude that there was reasonable doubt that Dale Dunson was the shooter. Id., p. 35. Dunson's attorney further argued that even though

every other eyewitness who testified said that Dale Dunson was wearing a hoodie at the time of shooting, but none could agree on its color.  Id.

The trial judge, Lester G. Nauhaus stated that he would view the video surveillance tape frame-by-frame as requested by Dale Dunson's attorney prior to rendering a verdict.[3]  He also noted that this case came down to credibility determinations between three eyewitnesses who claimed they saw Dale Dunson shoot Tyrone Edwards in the back of the head and one defense witness who admitted he did not see the shooting, but saw a person who he believed to be the shooter, fleeing the scene, and claimed the shooter was not Dale Dunson.  Id., p. 40.  On October 16, 2009, Judge Nauhaus indicated that he had watched the video 2-3 times and then he pronounced Dale Dunson guilty of third-degree murder.   10/16/2009 TT, p. 2-4.

### B.  Procedural History

As noted, the bench trial of Dale Dunson began on September 29, 2009, before the Honorable Lester G. Nauhaus, of the Court of Common Pleas of Allegheny County.  See 9/29/2009 TT, p. 1-158.  Thereafter, the trial was continued until October 13, 2009.  See 10/13/2009 TT, p. 1-47.  On October 16, 2009, Judge Nauhaus[4] found Petitioner guilty of third-degree murder.  See 10/19/2009 TT, p. 1-4.   During the entirety of the bench trial, Petitioner was represented by counsel, Eric A. Jobe.   Petitioner was sentenced to twenty to forty years of incarceration (to run concurrent to a 30-month federal sentence imposed by Judge Terrence McVerry).

---

[3] After waiving his right to a jury trial on September 29, 2009, the bench trial of Dale Dunson began before Judge Lester G. Nauhaus, of the Court of Common Pleas of Allegheny County.  See 9/29/2009 TT p. 1-158.

[4] The transcript from October 16, 2009 lists Judge David Cashman on the cover page, but this Court believes this to be a typographical error.

Petitioner timely filed a Notice of Appeal to the Superior Court of Pennsylvania through Mr. Jobe.  On appeal, Petitioner challenged whether the trial court imposed a sentence "which was manifestly excessive in contravention of the [Pennsylvania] sentencing scheme" when the facts did not support third-degree murder, but rather supported involuntary manslaughter.   On February 25, 2011, the Superior Court affirmed the trial court's sentence of twenty to forty years of incarceration.  Petitioner did not file a Petition for Allowance of Appeal with Pennsylvania's Supreme Court; nor did he file a Writ of Certiorari with the United States Supreme Court.

On January 24, 2012, Petitioner timely filed a *pro se* Motion for Post-Conviction Collateral Relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546.  Counsel for Petitioner, Veronica Bretensky, was appointed and shortly thereafter, she filed an Amended PCRA Petition, raising claims of trial counsel's ineffectiveness.  Specifically, Attorney Bretensky claimed that trial counsel had failed to present or call two eyewitnesses (Dave Dunson and Jeff Burton) to testify during the trial.  Attorney Bretensky then filed a Supplement to the Amended PCRA petition on October 12, 2012, alleging that trial counsel was ineffective for failing to preserve and/or litigate on appeal to the Superior Court: (1) that Petitioner's conviction of third degree murder was against the weight of the evidence; and (2) that the evidence was insufficient to support Petitioner's conviction.

On April 25, 2013, during the PCRA evidentiary hearing, Petitioner discovered that there were seven video surveillance disks.  Petitioner claims that he and his trial counsel, Mr. Jobe, were only aware of one video surveillance disk, and this singular disk was the only disk produced during discovery by the Assistant District Attorney.   Petitioner also claims none of the other video surveillance disks were like the one he viewed during his murder trial, and he further

alleges that one of the disks supports his own version of the facts and events surrounding the shooting of Tyrone Edwards on September 16, 2006.

On July 16, 2013, after receiving a Response from the Commonwealth of Pennsylvania, and after conducting an evidentiary hearing, Petitioner's PCRA Petition was denied.

On July 22, 2013, Attorney Bretensky timely filed an appeal with the Superior Court. On September 3, 2013, Attorney Bretensky timely filed a no-merit brief with the Superior Court and simultaneously filed a Petition to withdraw as counsel. The no-merit brief indicated that there was no merit to any of the three claims – (1) the original eyewitness claim; and the two supplemental claims (2) the weight of the evidence claim; and (3) the insufficiency of the evidence claim) – which were first raised before the PCRA and then again, on appeal to the Superior Court.

On May 28, 2014, the Superior Court affirmed the Order entered by the PCRA, which had dismissed Petitioner's PCRA Petition. Petitioner did not file a Petition for Allowance of Appeal with Pennsylvania's Supreme Court; nor did he file a Writ of Certiorari with the United States Supreme Court.

Next, Petitioner timely filed the instant *pro se* Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus with this Court. Doc. no. 4. The Commonwealth has filed a Response to the Petition (doc. no. 16). Petitioner filed a Reply (doc. no. 26) as well as a Motion for an evidentiary hearing. Doc. no. 25.

### III. Standards of Review

#### A. 28 U.S.C. § 2254 and AEDPA Standards – General

Dunson's Petition is governed by the federal habeas statute applicable to state prisoners, 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214, April 24, 1996 ("AEDPA"). Under this statute, habeas relief is only available on the grounds that Dunson's convictions were obtained in violation of his federal constitutional rights. 28 U.S.C. § 2254(a) (the court "shall entertain an application for a writ of *habeas corpus* in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.). Accordingly, "the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). Errors of state law are not cognizable. See, *e.g., Priester v. Vaughn*, 382 F.3d 394, 402 (3d Cir. 2004) ("Federal courts reviewing habeas claims cannot 'reexamine state court determinations on state-law questions.'") (*quoting Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)); *Real v. Shannon*, 600 F.3d 302, 309-10 (3d Cir. 2010) ("A federal court may re-examine a state court's interpretation of its own law only where this interpretation appears to be an obvious subterfuge to evade consideration of a federal issue.").

Thus, federal law requires this Court to defer to a state court's application of its own rules of evidence. *Estelle*, 502 U.S. at 67-68 (federal court on habeas review must not review state court rulings on admissibility of evidence under state law); *see also Homes v. South Carolina*, 547 U.S. 319, 324 (2006) ("'State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.'"); *Marshall v.*

*Lonberger*, 459 U.S. 422, 438 n. 6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules.").

As codified at 28 U.S.C. § 2254(d), AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Thus, AEDPA circumscribes a federal court's review of a state prisoner's federal constitutional claim when the state court has adjudicated that claim on the merits. Importantly, review under section 2254(d) is limited to the record that was before the state court. *Cullen v. Pinholster*, ___ U.S. ___, 131 S.Ct. 1388, 1398-1401 (2011) ("Although state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so. Provisions like §§ 2254(d)(1) and (e)(2) ensure that '[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.'") (citation omitted). *See also Roundtree v. Balicki*, 640 F.3d 530, 538 (3d Cir. 2011). As the Court of Appeals for the Third Circuit explained, "[i]n light of *Pinholster*, district courts cannot conduct evidentiary hearings to supplement the existing state court record under 28 U.S.C. § 2254(d). Otherwise, federal habeas petitioners would be able to circumvent the finality of state court judgments by establishing a new factual record." *Brown v. Wenerowicz*, 663 F.3d 619, 629 (3d Cir. 2011).

12

"If a claim has been adjudicated on the merits by a state court, a federal habeas

petition[er] must overcome the limitation of § 2254(d)(1) on the record that was before that state

court." *Id.*, quoting *Pinholster*, 131 S.Ct. at 1400 (footnote omitted). For the purposes of a

section 2254(d), "a claim has been 'adjudicated on the merits in State court proceedings' when a

state court has made a decision that finally resolves the claim based on its substance, not on a

procedural, or other, ground." *Thomas v. Horn*, 570 F.3d 105, 117 (3d Cir. 2009). When the

state court has not adjudicated a claim on the merits, AEDPA's standard of review at § 2254(d)

does not apply and the federal habeas court's review is *de novo. Id.* at 124.

This Court's analysis of those claims is governed by AEDPA's standard of review. Thus,

it is not for this Court to decide whether the Pennsylvania Superior Court's decision was right or

wrong. Rather, this Court has the authority to issue the writ of habeas corpus only if the state

court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the

United States," or "resulted in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The U.S. Supreme Court has stressed the "highly deferential" review that the federal

courts must accord the state court's decision:

> We have explained that "an unreasonable application of federal law is different
> from an incorrect application of federal law." *Williams v. Taylor*, 529 U.S. 362,
> 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Indeed, "a federal habeas court
> may not issue the writ simply because that court concludes in its independent
> judgment that the relevant state-court decision applied clearly established federal
> law erroneously or incorrectly." *Id.*, at 411, 120 S.Ct. 1495. Rather, that
> application must be "objectively unreasonable." *Id.*, at 409, 120 S.Ct. 1495. This
> distinction creates "a substantially higher threshold" for obtaining relief than
> *de novo* review. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 167
> L.Ed.2d 836 (2007). AEDPA thus imposes a "highly deferential standard for
> evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117
> S.Ct. 2059, 138 L.Ed.2d 481 (1997), and "demands that state-court decisions be

given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam).

*Renico v. Lett*, 559 U.S. 766, 773 (2010).

Even more pointedly, the Supreme Court elaborated:

If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Harrington v. Richter*, 562 U.S. 86, 103-104 (2011). *See also Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (it is not enough for a petitioner to show that the state court's adjudication of any of his claims was an "incorrect or erroneous" application of U.S. Supreme Court precedent); *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009) (where it is the state court's application of governing federal law that is challenged, "the state court's decision must be shown to be not only erroneous, but objectively unreasonable.") (internal citations and quotations omitted); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold").

"In determining whether a state court unreasonably applied federal law under 28 U.S.C. § 2254(d)(1), 'a habeas court must determine what arguments or theories supported or . . . could

have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court].'" *Wenerowicz*, 663 F.3d at 630 (quoting *Harrington*, 131 S.Ct. at 786. Thus, the question is "not whether the state court's holding was wrong, but whether it was reasonable," and "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S.Ct. 786 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

**B. Threshold Requirement under 28 U.S.C. § 2254**

Section 2254 of Title 28 of the United States Code reads in pertinent part:

> (b)      (1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—
>
>          (A)     the applicant has exhausted the remedies available in the courts of the State; or
>
>          (B)     (i) there is an absence of available State corrective process; or
>
>             (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.
>
>      (2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.
>
>      (3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.
>
> (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he

has the right under the law of the State to raise, by any available procedure, the question presented.

28 U.S.C. §2254.

## A.    Timeliness

Before discussing either of Petitioner's two claims herein, this Court must first determine whether the instant Petition is timely.  The Commonwealth's Response to the instant Petition thoroughly outlines the events and notes the dates of each event relevant to the timeliness determination.  See doc. no. 16, p. 9-10.  This Court finds that the Commonwealth properly calculated the time that Petitioner had to file the instant Petition – he had until August 28, 2014 – and thus, the instant Petition (filed on August 13, 2014) is timely.

## B.  Exhaustion

Next, this Court must address the threshold question of whether Petitioner exhausted the "remedies available [to him] in the courts of the State."  28 U.S.C. § 2254(c).  This is known as "comity," whereby the state is afforded an opportunity to correct its own errors, if any.

As noted by the Commonwealth, the United States Supreme Court in *O'Sullivan v. Boerckel,* 526 U.S. 838, 848-49 (1999) required a state prisoner – such as Petitioner here – to present his claims to that state's highest court – here, the State Supreme Court – in order to satisfy 28 U.S.C. § 2254(c).  However, the United States Court of Appeals for the Third Circuit subsequently held that a litigant – such as Petitioner here – did not have to file a Petition for an allowance of appeal with Pennsylvania's Supreme Court following an adverse decision by the Superior Court.  *Lambert,* 387 F.3d at 233-34.

## C.  Procedural Default

However, there is another basis related to exhaustion – namely, that Petitioner's federal habeas claim had to have been "fairly presented" to the state court.  See, *O'Sullivan, supra.*  A

16

federal habeas claim may be deemed "unexhausted" if Petitioner herein, raises arguments in the state court based entirely on state law. Stated another way, if the state court record is utterly lacking any evidence of Petitioner presenting a constitutional basis for his claim he has not exhausted his state court remedies. See *Duncan, supra.*

However, this Court may opt to "excuse" this particular exhaustion requirement as long as exhaustion was rendered "impossible" due to a "procedural default" – meaning the claim can no longer be raised in state court. As noted by the Court of Appeals for the Third Circuit:

> The procedural default doctrine precludes a federal habeas court from "review[ing] a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (emphasis added). The United States Supreme Court has employed a variety of tests to determine whether a state ground is "adequate." Among other things, state procedural rules have been held to be inadequate if they are not "firmly established and regularly followed," *Ford v. Georgia*, 498 U.S. 411, 424, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348–51, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984)); *see also Barr v. City of Columbia*, 378 U.S. 146, 149, 84 S.Ct. 1734, 12 L.Ed.2d 766 (1964), or if they are "novel [ ]" and unforeseeable. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 457, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); see also Ford, 498 U.S. at 424, 111 S.Ct. 850.

*Brohnstein v. Horn*, 404 F.3d 700, 707 (3d Cir. 2005).

## IV. Discussion of Petitioner's Claims

Petitioner has raised two claims in his habeas petition:

(1) Did the Commonwealth commit a bad faith violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963), ignore Pennsylvania Rule of Criminal Procedure 573, by withholding impeachment evidence, *i.e.* surveillance video disks from the defense?

(2) Is Petitioner entitled to remand for a new sentencing hearing, where the court abused its discretion in imposing sentence and where the sentence imposed was excessive and harsh, considering the court failed to consider mitigating factors?

### A. Claim #1 – the *Brady* Claim

"In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme

Court set out the rule that 'the suppression by the prosecution of evidence favorable to an

accused upon request violates due process where the evidence is material either to guilt or to

punishment. . . ." *Simmons v. Beard*, 590 F.3d 223 (3d Cir. 2009), quoting *Brady*, 373 U.S. at

87.

### 1. Exhaustion/Procedural Default

On May 28, 2014 the Superior Court of Pennsylvania, in affirming the Order entered by

the PCRA, noted that on April 22, 2014, Dunson filed a *pro se* Response to Attorney

Brestensky's no merit brief.  In its unpublished, non-precedential opinion, the Superior Court

indicated that it accepted Dunson's *pro se* filing even though it was submitted out of time and

raised additional issue for the Court to review.  See p. 4.

More importantly, the Superior Court stated:

> Dunson attempts to raise a claim pursuant to *Brady v. Maryland*,
> 373 U.S. 83 (1963), regarding the alleged failure by the Commonwealth to
> provide additional surveillance footage. Attorney Brestensky briefly
> mentioned in her *Turner/Finley* brief that, to the extent Dunson may
> assert such a claim, "the additional footage does not present any evidence
> exculpating him.  Further, that footage would not likely have changed the
> result at trial." *Turney/Finley* Brief, at 23-24.

> Initially, we note that this issue was not raised in Dunson's *pro se*
> PCRA petition or Attorney Brestensky's amended PCRA petition.  If an issue
> is not raised in the PCRA petition, then it cannot be considered on appeal.
> *Commonwealth v. Wallace*, 724 A.2d 916, 921 n.5 (Pa. 1999); *see also*
> *Commonwealth v. Knighten*, 742 A.2d 679, 683 (Pa. Super. 1999).
> However, it appears this was the first opportunity for Dunson to raise such a
> claim, as facts related to this claim did not arise until he was represented by
> Attorney Brestensky during the PCRA proceedings.  *See Commonwealth v.*
> *Griffin*, 644 A.2d 1167, 1170 (Pa. 1994) (to preserve claims of
> ineffectiveness of counsel, the claim must be raised at the earliest stage in
> the proceedings at which the allegedly ineffective counsel no longer
> represented the appellant).

Here, the Commonwealth, during discovery, provided trial counsel, Attorney Eric A. Jobe, a CD containing footage from six different surveillance cameras separated into six separate files. Attorney Jobe played a portion of the video at the non-jury trial, admitted the CD containing all of the files into evidence, and gave it to the trial court to review frame-by-frame. N.T., 10/14/ 09, at 2, 6-13, 32. The trial court rendered its verdict after review of the video surveillance "not only once, but two or three times." N.T., 10/16/09, at 2.

After Attorney Brestensky was appointed, she was provided with a copy of the CD. N.T., 4/25/13, at 28-30. Attorney Brestensky filed a Motion to Supplement the Record with the CD and a still photograph printout from one of the CD files labeled "Poss.Actor Vehicle22.psn.," which was granted. Dunson filed a pro se letter stating that the still photograph was not from the portion of the video played during his trial.

Dunson claims in his response that the surveillance footage, "Poss.Actor Vehicle22.psn.," which Attorney Brestensky states refutes Dunson's claim that he never got out of the car, is not the best evidence. Dunson asserts that the "Poss.Actor Vehicle22.psn" footage is from a quarter of a mile away from the scene, while the footage in "Bentley Dr. Shooting.pns" is from only 250 feet away from the scene. Dunson asserts that the "Bentley Dr. Shooting.pns" footage does not depict someone coming from the courtyard, going into Dunson's vehicle, and leaving the scene as Attorney Brestensky states the other footage depicts. Appellant's Response, at 2-3.

Doc. no. 16-6, p. 4-6.

After citing the applicable rule of law from *Brady* case, Superior Court concluded:

Dunson fails to prove that this evidence was withheld, as he offers no evidence the Commonwealth withheld or suppressed the CD. Attorney Jobe admitted the CD containing all six files, including Dunson's preferred file, into evidence. The trial court reviewed the entire CD before rendering its verdict. Therefore, it is irrelevant from what camera angle the still photograph was taken, since the entirety of the CD was entered into evidence and reviewed. Further, Dunson fails to prove that the footage from "Bentley Dr. Shooting.pns" is favorable to him. Instead, he baldly states that it provided exculpatory evidence that would likely have changed the result of the trial because it does not show the same detail as the "Poss.Actor Vehicle22.psn" file. Moreover, the "Poss.Actor Vehicle22.psn" footage is corroborative of the three witnesses' testimony that Dunson returned from behind the courtyard with a gun and fired it at least twice. See N.T., 9/29/09, at 47, 49, 107. Accordingly, this claim fails.

*Id.*, p. 7.

It is clear that Petitioner exhausted his first claim in state court and is not procedurally defaulted. Accordingly, this court must review the merits of Petitioner's *Brady* claim.

## 2. Merits of the *Brady* Claim

Based upon the above-quoted portions of the Superior's Court unreported Opinion, the Superior Court undoubtedly concluded that no *Brady* violation took place. As noted in the "Standard of Review" section of this Opinion, see page __ above, this Court, when deciding claims advanced by a petitioner in federal habeas case, must presume the factual correctness of the conclusions reached by the state courts. In *Lark v,. Sec'y PA Dept. of Corrections,* 645 F.3d 596 (3d Cir. 2011), the Court of Appeals held:

> . . . [I]n the habeas corpus context federal courts owe the same deference to implicit state court factual findings as they afford to explicit state court factual findings. *See, e.g., LaVallee v. Delle Rose*, 410 U.S. 690, 692, 93 S.Ct. 1203, 1204, 35 L.Ed.2d 637 (1973) (per curiam); *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir.2000) ("[A]n implicit finding of fact is tantamount to an express one, such that deference is due to either determination.").

*Id.*, p. 610.

Petitioner does not articulate how the Pennsylvania Superior Court erred. This Court finds that the Superior Court utilized the proper standard of care when evaluating Petitioner's *Brady* claim, then it carefully reviewed the record below and found that <u>all</u> of the videotape surveillance evidence was disclosed to his trial attorney, the relevant portion was moved into evidence, and viewed multiple times by the trial judge. Accordingly, this Court finds that Petitioner has failed to overcome the presumption that the state courts' conclusions were factually correct. For this reason, Petitioner's *Brady* claim shall be dismissed.

**B. Claim #2 – Petitioner's Claim for a New Sentencing Hearing**

As noted above, Petitioner has requested a new sentencing hearing, claiming that the state court abused its discretion by imposing a sentence which was harsh, excessive, and failed to consider mitigating factors. This claim can also be dismissed because it was not exhausted in state court.

As noted above, Petitioner's claim specifically asks whether he, "[i]s . . . entitled to remand for a new sentencing hearing, where the court abused its discretion in imposing sentence and where the sentence imposed was excessive and harsh, considering the court failed to consider mitigating factors?"

When Petitioner, here, was before the Pennsylvania Superior Court his claim was set forth as follows:

> Whether the Honorable Trial Court imposed a sentence which was manifestly excessive in contravention of the PA sentencing scheme as a whole where the defendant was sentenced to twenty to forty years after being convicted of [t]hird [d]egree [m]urder where facts of the case indicate that the shooting was indicative of an [i]nvoluntary [m]anslaughter?

Doc. no. 16-1, p. 34. Petitioner's trial counsel, Eric Jobe, prepared this brief to the Superior Court and crafted the above issue. The appellate brief which Mr. Jobe prepared on behalf of Petitioner cited no federal law in relation to this specific claim. On February 25, 2011, the Superior Court issued its Opinion and cited no federal law when resolving this claim. Doc. no. 16-2, p. 13-20.

More importantly, however, the Superior Court in its February 25, 2011 Opinion held as follows:

> Herein, Appellant's notice of appeal was filed timely. However, as the Commonwealth accurately observes, he did not preserve this issue in a post-sentence motion. Thus, it is waived. See Pa.R.A.P. 302 (issues not

raised in the lower court are waived and cannot be raised for the first time on appeal). In *Commonwealth v. Foster*, 960 A.2d 160, 163 (Pa.Super. 2008), *appeal granted*, 968 A.2d 224 (Pa. 2009), we noted: "Claims relating to the discretionary aspects of a sentence are waived if not raised either at sentencing or in a post-sentence motion." (citing *Commonwealth v. Shugars*, 895 A.2d 1270 (Pa.Super. 2006)). Similarly, we are foreclosed from determining whether Appellant objected during the sentencing proceedings because Appellant failed to request the notes of testimony for the December 3, 2009 sentencing hearing. The certified record reveals that trial counsel did not request to have the pertinent notes of testimony transcribed. Indeed, counsel requested only the notes of testimony for the September 29, 2009 non-jury trial. See Notice of Appeal, 1/4/10, Exhibit B; see also Pa.R.A.P. 1911(a); *Commonwealth v. Preston*, 904 A.2d 1, 7 (Pa.Super 2006) (*en banc*) ("any claims that cannot be resolved in the absence of the necessary transcript or transcripts must be deemed waived for the purpose of appellate review.").

We further observed that since the sentencing claim relates to the discretionary aspects of the sentence, Appellant's "inclusion of the issue in his Pa.R.A.P. 1925(b) statement will not save it from being waived because [the a]ppellant failed to raise it in the court below, as required by Pa.R.A.P. 302(a) ('Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.')." *Foster*, supra at 163 (citing *Commonwealth v. Melendez-Rodriguez*, 856 A.2d 1278 (Pa.Super. 2004) (*en banc*)). As Appellant's present sentencing claim is waived due to his failure to raise it at sentencing or in a post-sentence motion, we cannot address it.

Doc. no. 16-2, p. 15-16.

Given these conclusions reached by Pennsylvania's Superior Court, Petitioner's second claim has been procedurally defaulted because the direct appeal of this issue was waived on direct appeal to the Superior Court. Moreover, as noted at p. 16 of this Opinion, above, Petitioner did not have to file a petition for an allowance of appeal with Pennsylvania's Supreme Court following the adverse waiver decision by the Superior Court. *Lambert*, 387 F.3d at 233-34.

After the Superior Court issued its February 25, 2011 decision, Petitioner filed his *pro se* PCRA appeal and included this claim in his submission. However, the Superior Court again addressed this claim in the following fashion:

> Dunson also attempts to raise a claim that his sentence is excessive. Dunson raised the same on direct appeal. This Court affirmed Dunson's sentence, finding that even if the claim were not waived, it lacks merit. *Commonwealth v. Dunson*, 16 WDA 20 10 (Pa. Super. Feb. 25, 2011) (unpublished memorandum). Because this Issue has been addressed on direct appeal and thus previously litigated, we cannot address it here. *See Commonwealth v. Busanet*, 54 A .3d 35, 45 (Pa. 2012) (the petitioner must demonstrate that the issues raised in his petition have not been previously litigated or waived).

Doc. no. 16-6, p. 8.

Based on the foregoing, this Court finds that Petitioner's second claim raised herein, which concerns the alleged excessiveness of Petitioner's sentence, is procedurally defaulted and thus, this claim must be dismissed.

**C. Petitioner's Motion for an Evidentiary Hearing (doc. no. 25)**

In light of the Court's discussion of both claims, above, which serve as the basis for this Court's decisions with respect to each of the two claims raised by Petitioner in his Petition Under § 2254, the Court finds that Petitioner's Motion for an Evidentiary Hearing (filed on May 27, 2015 at doc. no. 25), should be denied as moot.

**V. Conclusion**

For all of the foregoing reasons, the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (doc. no. 4) will be denied by separate Order of Court.[5] In addition, Petitioner's Motion for an Evidentiary Hearing (doc. no. 25), will be denied as moot in

---

[5] As noted at *infra*., the United States Supreme Court in *Rose v. Lundy* held that a district court must dismiss a state prisoner's habeas corpus petition containing both exhausted and unexhausted claims. 455 U.S. at 510.

the same Order.

A district court issuing a final order dismissing a § 2254 petition must also decide whether to issue a certificate of appealability. See 3d Cir. L.A.R. 22.2 (2008). A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c) (2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). This Court has held that habeas relief is not available because "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington*, 131 S.Ct. at 786-87. Consequently, the Court declines to issue a certificate of appealability because petitioner has failed to make a substantial showing of the denial of a constitutional right.

For the foregoing reasons, Dunson's Section 2254 petition is dismissed. The Court also finds no basis for the issuance of a certificate of appealability. An appropriate order will follow.

<u>s/ Arthur J. Schwab</u>
Arthur J. Schwab
United States District Judge

cc:   All Registered ECF Counsel and Parties
        and
     Dale Gene Dunson
     JH-2710
     SCI Dallas
     1000 Follies Road
     Dallas, PA 18612